# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PACIRA BIOSCIENCES, INC. and  )
PACIRA CRYOTECH, INC.,  )
  )
    Plaintiffs,  )
  )
    v.  )  C.A. No. 2020-0694-PAF
  )
FORTIS ADVISORS LLC, SOLELY  )
IN ITS CAPACITY AS  )
REPRESENTATIVE OF THE  )
FORMER SECURITYHOLDERS OF  )
MYOSCIEINCE, INC., TIMOTHY  )
STILL, GUMBALLA KRIS KUMAR,  )
JESSICA PRECIADO, and THE  )
FORMER SECURITYHOLDERS OF  )
MYOSCIENCE, INC.,  )
  )
    Defendants.  )

## MEMORANDUM OPINION

Date Submitted: June 2, 2021
Date Decided: October 25, 2021

Lisa A. Schmidt, Raymond J. DiCamillo, Megan E. O'Connor, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Randy M. Mastro, Declan T. Conroy, GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Attorneys for Plaintiffs*.

R. Judson Scaggs, Jr., Lauren K. Neal, Sarah P. Kaboly, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Christopher J. Marino, DAVIS MALM & D'AGOSTINE, P.C., Boston, Massachusetts; *Attorneys for Defendant Fortis Advisors LLC*.

Henry E. Gallagher, Jr., Shaun Michael Kelly, Jarrett W. Horowitz, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; *Attorneys for Defendants Timothy Still, Gumballa Kris Kumar, and Jessica Preciado*.

**FIORAVANTI, Vice Chancellor**

Pacira BioSciences, Inc. ("Pacira") acquired MyoScience, Inc. ("MyoScience") in a 2019 merger (the "Merger"). The merger agreement provided for an up-front cash payment to MyoScience's former securityholders along with contingent consideration if certain post-closing milestones have been achieved. Pacira has made certain milestone payments but seeks a declaration that it is not required to make further milestone payments. That claim is not the subject of this opinion. This opinion addresses a motion to dismiss the other six counts of the complaint.

Pacira contends that the securityholders' representative and three former employees and securityholders of MyoScience owed and breached contractual obligations, either direct or implied, not to interfere with Pacira's operation of the acquired company, now Pacira CryoTech, Inc. ("Pacira CryoTech" and together with Pacira, the "Plaintiffs"). The defendants have moved to dismiss those claims, and this opinion concludes that no such contractual obligation exists under the plain language of the merger agreement. Nor does the complaint state a claim under the implied covenant of good faith and fair dealing that the defendants made bad faith demands for milestone payments, interfered with Plaintiffs' relationships with their employees, or impermissibly retained MyoScience's former outside legal counsel. Plaintiffs have also asserted breach of contract and breach of fiduciary duty claims against two of the individual defendants based on post-merger conduct, and a claim

against the other individual defendant for aiding and abetting those breaches of fiduciary duty. This opinion dismisses those claims for lack of personal jurisdiction over the individual defendants.

## I.   BACKGROUND

Unless otherwise specified, the facts recited in this Memorandum Opinion are drawn from the Verified Complaint (the "Complaint" or "Compl.") and documents integral thereto.[1]

### A.   The Parties

Pacira is a "provider of non-opioid pain management solutions."[2] Pacira is a Delaware corporation based in Parsippany, New Jersey.[3] Pacira CryoTech is a Delaware corporation based in Fremont, California and a wholly owned subsidiary of Pacira.[4] Pacira CryoTech is a successor to MyoScience, a Delaware corporation that Pacira acquired pursuant to an Agreement and Plan of Merger, dated March 4, 2019, by and among Pacira Pharmaceuticals Inc.,[5] PS Merger, Inc., MyoScience,

---

[1] Dkt. 1. Exhibits attached to the Complaint will be cited as "Ex."

[2] Compl. ¶ 3.

[3] *Id.* ¶ 26.

[4] *Id.* ¶¶ 27, 191.

[5] Pacira Pharmaceuticals, Inc. changed its name upon completion of the Merger to Pacira Biosciences, Inc. (i.e., Pacira). *See* Pacira BioSciences, Inc. Annual Report (Form 10-K) at 7 (filed March 1, 2021). Under Rule 201 of the Delaware Uniform Rules of Evidence, the court can take judicial notice of this fact for purposes of the pending motions. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (holding that

Inc., and Fortis Advisors LLC ("Fortis"), as the Securityholders' Representative (the "Merger Agreement").[6] MyoScience, and now Pacira CryoTech, manufactures iovera® ("iovera"), a medical device that "applies controlled doses of extreme cold to targeted nerves to relieve pain."[7]

Fortis (or the "Securityholders' Representative") serves as the representative of the MyoScience Securityholders (as defined below) pursuant to the Merger Agreement.[8] Defendants Timothy Still ("Still"), Gumballa Kris Kumar ("Kumar"), and Jessica Preciado ("Preciado") were MyoScience employees prior to the Merger. Kumar, Preciado, and Still all reside in California, and they are collectively referred to as the "Individual Defendants." None of the Individual Defendants is a party to the Merger Agreement.

Still was the CEO of MyoScience.[9] Following the Merger, Still became a member of a three-person "Advisory Committee" to Fortis.[10]

---

the court may take judicial notice of public documents such as SEC filings required by law to be filed).

[6] Ex. A. ("Merger Ag't."). The Merger Agreement refers to Pacira as the "Parent", MyoScience as the "Company" or the "Surviving Corporation", and Fortis as the "Securityholders' Representative." *Id.*

[7] Compl. ¶ 3.

[8] *Id.* ¶ 28.

[9] *Id.* ¶ 29.

[10] *Id.* ¶ 122.

Kumar is a former head of Marketing & Product Management at MyoScience.[11] "Following Pacira's acquisition of MyoScience, Kumar worked for six months as a consultant for Pacira [CryoTech]."[12]

Preciado is the former Principal Scientist at MyoScience.[13] Following Pacira's acquisition of MyoScience, Pacira retained Preciado as Senior Director, Health Outcomes Value Assessment.[14]

## B. Pacira Acquires MyoScience

Pacira acquired MyoScience in the Merger for $120 million in cash, subject to certain adjustments, and contingent payments ("Milestone Payments") of up to $100 million to former MyoScience stockholders or option holders.[15] The Merger closed on April 9, 2019.[16] The former MyoScience stockholders or option holders entitled to Milestone Payments executed either a Letter of Transmittal for Securities of MyoScience or an Option Holder Letter of Transmittal for Company Options of MyoScience (the "Option Holder Letter").[17] The foregoing signatories are referred

---

[11] *Id.* ¶ 30.

[12] *Id.* ¶¶ 30, 124.

[13] *Id.* ¶ 31.

[14] *Id.*

[15] *Id.* ¶ 4; Merger Ag't. § 1.11.

[16] Pacira Biosciences, Inc., Current Report (Form 8-K) (Apr. 9, 2019).

[17] Compl. ¶¶ 32, 95; Merger Ag't. §§ 1.15(a)–(c).

to as the "Escrow Participants" or "MyoScience Securityholders."[18]  Among other

milestones triggering Milestone Payments, the Merger Agreement required Pacira

to pay up to $50 million to the Escrow Participants if treatments involving iovera in

certain specified medical settings could be reimbursed at certain specified levels

within a certain period of time.[19]

### C.   The iovera Product and CPT Codes

iovera is a patented Class II FDA-cleared handheld medical device that

administers "cryoanalgesia" or "cryoneurolysis"—the application of "controlled

doses of extreme cold temperature to targeted nerves to relieve pain."[20]  iovera goes

under several technical names that the Merger Agreement refers to as "Smart Tip

Products."[21]  Pacira alleges that

> [a]ccording to the [FDA's] Indication Statement for the product, iovera can
> be used to (i) "destroy tissue during surgical procedures," (ii) "produce lesions
> in peripheral nervous tissue by the application of cold to the selected site for
> the blocking of pain," and (iii) "relie[ve] [] pain and symptoms associated
> with osteoarthritis of the knee for up to 90 days."[22]

---

[18] "Escrow Participants" are defined in the Merger Agreement as "the holders of Series G
Preferred Stock, Series F Preferred Stock, and Carve-Out Common Stock, Qualifying
Warrant Holders and Qualifying Option Holders."  Merger Ag't. Ex. A.

[19] Compl. ¶¶ 8, 102–04; *see* Merger Ag't. §§ 1.15(a)(iv), (b)(i).

[20] Compl. ¶ 36; *see id*. ¶ 59.

[21] *Id*. ¶ 102 n.2.

[22] *Id*. ¶ 37.

The success of iovera "was closely tied" to reimbursement rates and guidance issued by the Centers for Medicare and Medicaid ("CMS").[23] In order to be reimbursed by an insurance payer (*e.g.*, Medicare or Medicaid) for performing a medical procedure on a patient, a medical provider must be able to describe that procedure using a generalized description known as a Current Procedural Terminology code ("CPT Code").[24] The responsibility for maintaining and publishing the list of CPT Codes falls to American Medical Association ("AMA"), which also provides guidance on how to apply the codes.[25] CMS sets the reimbursement rates for each CPT Code pursuant to Section 1848(b) of the Social Security Act.[26] The reimbursement rates must be updated each year and are published in the Medicare Physician Fee Schedule.[27]

The CPT Codes have national reimbursement rates as well as locality-specific reimbursement rates. To determine the national reimbursement rate for a given CPT Code, CMS quantifies and aggregates the costs of applying the procedures associated with the CPT Code across several categories.[28] CMS also develops a

---

[23] Compl. ¶ 39.

[24] *Id.* ¶¶ 38–39.

[25] *Id.* ¶¶ 5, 41.

[26] Social Security Act § 1848(b), 42 U.S.C. § 1395w–4.

[27] *Id.*; Compl. ¶ 39.

[28] Compl. ¶ 44.

6

geographic practice cost index for each of more than 110 different localities that is used to determine locality-adjusted reimbursement rates.[29] According to Plaintiffs, "[w]hen CMS publicizes the reimbursement rates for various CPT Codes, it consistently cites to the standard, nationwide reimbursement rates for those codes, not to the dozens of different locality-adjusted reimbursement rates."[30]

As part of the annual process for updating the reimbursement rates, CMS solicits "feedback from practitioners and industry groups regarding the costs associated with types of procedures performed under the various CPT codes."[31] CMS then publishes draft reimbursement rates in July for a public comment period.[32] After the comment period closes, "CMS reviews the feedback from industry participants, updates reimbursement rates as appropriate, and then publishes the final rules" for the upcoming calendar year in November.[33]

The usage of a medical procedure depends in part on at least two factors. First, it is important that the CPT Codes reflect the actual costs of the medical procedure to ensure that the provider will be fully reimbursed for the costs of the procedure.[34]

---

[29] *Id.* ¶¶ 46, 47.

[30] *Id.* ¶ 48.

[31] *Id.* ¶ 49.

[32] *Id.* ¶¶ 51, 52.

[33] *Id.* ¶ 52.

[34] *Id.* ¶ 53.

Second, the popularity of a particular procedure depends on the clarity of guidance from the AMA on the reimbursement rate for that procedure; "[p]ractitioners who assign the wrong CPT Codes to procedures risk costly audits of their reimbursement requests, as well as possible clawback of reimbursement payments."[35]   With inconsistent or ambiguous guidance, medical device manufacturers face the risk that the usage of their device will "plummet."[36]

### D.   MyoScience Seeks New CPT Codes and Favorable Reimbursement Rates

Prior to the Merger, the Individual Defendants, on behalf of MyoScience, mounted a campaign in 2018 and 2019 to clarify which CPT Codes "should apply to procedures that used the [iovera] product to treat knee pain" and to persuade the AMA to rescind its "confusing" prior guidance.[37]   The Individual Defendants worked with Gail Daubert, MyoScience's "outside reimbursement counsel" to persuade the AMA to rescind prior 2018 guidance recommending that practitioners use a vague catch-all code for cryoneurolysis.[38]  The effort succeeded; in April 2019, the AMA published a document clarifying that cryoneurolysis may be reported using

---

[35] *Id.* ¶ 54.

[36] *Id.* ¶ 55.

[37] *Id.* ¶¶ 58–59, 64–72.

[38] *Id.* ¶¶ 7, 15, 64, 69–72, 72 n.1.

a more specific code, CPT Code 64640,[39] which covers "[d]estruction by neurolytic [i.e., nerve blocking] agent; other peripheral nerve or branch."[40]

A new opportunity to come under a favorable CPT Code emerged in May 2018, when "CMS announced a number of new CPT Codes that would become available to practitioners on January 1, 2020."[41] Among the new additions was CPT Code 64xx1, a "placeholder code"[42] specifically dedicated to a procedure that "destr[oys]" the "genicular nerve branches" by a "neurolytic agent."[43] CMS uses "x"s instead of numbers in the placeholder codes to signify that the code is still in draft form; CMS then replaces the "x"s with numbers when the code is finalized.[44]

Plaintiffs assert that, because CPT Code 64xx1 applied specifically to *knee-related* cryoneurolysis, both MyoScience and the Individual Defendants understood the development of the code to be "highly relevant to reimbursement rates for the use of iovera."[45] MyoScience and the Individual Defendants thus teamed up with

---

[39] *Id.* ¶ 72.

[40] *Id.* ¶ 63.

[41] *Id.* ¶ 74.

[42] *Id.* ¶ 76.

[43] *Id.* ¶ 75.

[44] *Id.* ¶ 76.

[45] *Id.* ¶ 82.

Daubert again to "influence CMS as it drafted the reimbursement rates that would apply to CPT Code 64xx1 pre-merger."[46]

These efforts were ongoing while the representatives of MyoScience (including Still) negotiated the terms of Pacira's acquisition of MyoScience.[47] The Plaintiffs maintain that this backdrop "led to the inclusion of the CMS Reimbursement Milestones in the Merger Agreement."[48]

### E.    The Mechanics of the Milestone Payment Provisions

#### 1.    The Milestone Payments

Section 1.15(a) of the Merger Agreement requires that certain Milestone Payments be made to the Escrow Participants "in the event the corresponding milestones" are achieved "at any time following the Closing."[49] The milestones fall into four categories: (i) "Regulatory Milestones"; (ii) "Costs of Goods Sold"; (iii) "Sales Milestones"; and (iv) "CMS Reimbursement Milestones." Most pertinent here, Section 1.15(a)(iv) ("CMS Reimbursement Milestones") requires Pacira to pay the Escrow Participants an amount equal to:

> (1) in the case of reimbursement related to use of the Smart Tip Products to treat a patient in the office setting . . . $20,000,000, if CMS Reimbursement is effective in fiscal year 2020 in an amount equal to or greater than $600.00 per such procedure using such product pursuant to CPT Code 64xx1 (or a different

---

[46] *Id.* ¶ 84; *see id.* ¶ 86.

[47] *Id.* ¶ 91.

[48] *Id.* ¶ 92.

[49] Merger Ag't., § 1.15(a).

code that is appropriate to describe a procedure in which the Smart Tip Products are used) . . .

(2) in the case of reimbursement related to use of the Smart Tip Products to treat a patient in the ambulatory surgery centers setting . . . $20,000,000, if CMS Reimbursement is effective in fiscal year 2020 in an amount equal to or greater than $800.00 per such procedure using such product pursuant to CPT Code 64xx1 (or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used) . . . [and]

(3) in the case of reimbursement related to use of the Smart Tip Products to treat a patient in the out-patient hospital setting, $10,000,000, if CMS Reimbursement is effective at any time during the Milestone Achievement Period in an amount equal to or greater than $1,400.00 per such procedure using such product pursuant to CPT Code 64xx1(or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used).

Sections 1.15(a)(iv)(i) and (ii) also provide for reductions in payments if the relevant milestone is met "after the end of fiscal year 2020" but before December 31, 2023.[50] The obligation to make any Milestone Payments terminates after December 31, 2023.[51] The Milestone Payments must be paid "[n]o later than 60 days after the end of the fiscal quarter in which the applicable Milestone is achieved."[52]

---

[50] *Id.* § 1.15(b)(i) (defining the "Milestone Achievement Period" as the period starting on January 1, 2019 and ending on December 31, 2023). The Merger Agreement does not define the phrase "fiscal year 2020."

[51] *Id.*

[52] *Id.* § 1.15(c)(i).

## 2. The Parties' Rights Under the Milestone Provisions

Section 1.15(d) of the Merger Agreement requires that "[f]ollowing the Closing and for the duration of the Milestone Achievement Period, [Pacira] shall operate [Pacira CryoTech] in good faith in the context of this Section 1.15 and shall use commercially reasonable efforts to achieve the Milestones."[53] Further, Section 1.15(e) provides, in pertinent part, that:

> (i) the sole and exclusive right of the Escrow Participants under this Section 1.15 will be to receive, subject to the other terms of this Agreement, the Milestone Payments payable pursuant to this Section 1.15 if [Pacira CryoTech] achieves such Milestone Payments within the time periods set forth herein and subject to each of the other conditions and qualifications contemplated herein;
>
> (ii) [Pacira] will have the right to operate the business of [Pacira CryoTech] as it chooses, in its sole discretion, except as expressly set forth in this Section 1.15; [and]
>
> (iii) [Pacira] is not under any obligation to provide any specific level of investment or financial assistance to [Pacira CryoTech] or to undertake any specific actions (or to refrain from taking any specific actions) with respect to the operation of the Surviving Corporation, except as expressly set forth in this Section 1.15.[54]

## 3. The Option Holder Letter

As a precondition to receiving its portion of the merger consideration, including the Milestone Payments, each MyoScience Securityholder was required to

---

[53] *Id.* § 1.15(d).

[54] *Id.* §§ 1.15(e)(i)–(iii).

execute either a Letter of Transmittal for Securities of MyoScience or an Option Holder Letter.[55] Pursuant to those agreements, the signatory's "MyoScience shares or options to purchase MyoScience shares, respectively, were converted into the right to receive payments pursuant to the Merger Agreement."[56] Each of the Individual Defendants executed a copy of the Option Holder Letter.[57] The Option Holder Letter incorporates certain sections of the Merger Agreement, to which the Individual Defendants agreed to be bound in their capacities as "Escrow Participants", "Indemnifying Securityholders", "Qualifying Option Holders" or "Securityholders."[58]

Section (a) of the Option Holder Letter also provides that, by executing the Option Holder Letter, the signatory appoints Fortis as "its true and lawful attorney-in-fact with full power of substitution . . . and exclusive agent pursuant to the terms of the Merger Agreement, the Escrow Agreement and related documents."[59] The signatory of each Option Holder Letter "consents to the taking of any and all actions

---

[55] Compl. ¶ 32; *see* Merger Ag't. §§ 1.11, 1.18(b). The Merger Agreement also required the holders of certain "Qualifying Company Warrants" for shares in MyoScience to execute a Warrant Cancellation Agreement as a precondition for receiving cash consideration for their warrants. Merger Ag't. § 1.10.

[56] Compl. ¶ 32.

[57] Exs. B–D ("Option Holder Ltrs."). When referring to the actions of the Individual Defendants in connection with the Option Holder Letter, this Opinion refers to the actions taken by Kumar, Preciado, and Still with respect to their respective Option Holder Letters.

[58] *Id.* § (a).

[59] *Id.* § (a)(i).

and the making of any decisions required or permitted to be taken by the Securityholders' Representative under the Merger Agreement, the Escrow Agreement and related documents as if expressly confirmed and ratified in writing by the undersigned."[60]

Section (d) of the Option Holder Letter states that the payment of the merger consideration "is conditioned on multiple items, including (i) closing of the Transaction and, if applicable, receipt of the [proceeds] by the [paying agent] and (ii) receipt by the Company, Paying Agent and Parent, as applicable, of an accurately completed [Option Holder Letter] and required attachments."[61]

The Option Holder Letter is governed by Delaware law, and each signatory "consents to the exclusive jurisdiction of the state and federal courts sitting in the State of Delaware and consents to personal jurisdiction of and venue in such courts with respect to any and all matters or disputes arising out of this [agreement]."[62]

**F.    Post-Merger Conduct of the Parties Leading to the Present Dispute**

**1.    The Post-Merger Roles of the Individual Defendants**

Following the merger, Kumar worked as a consultant for Pacira CryoTech for six months starting on April 9, 2019.[63]  The terms of that agreement are contained

---

[60] *Id.* § (a)(ii).

[61] *Id.* § (d).

[62] *Id.* § (g).

[63] Compl. ¶¶ 30, 124.

in a consulting agreement (the "Consulting Agreement"). Among other terms, the Consulting Agreement required Kumar to "refrain from publishing, distributing, or disclosing"[64] information defined as "Confidential" without the company's prior written consent for a period of three years.[65] The Consulting Agreement states that Kumar's "relationship with Company is and shall be that of an independent contractor, and neither party is authorized to nor shall act as the agent of the other."[66]

After the Merger closed, Preciado became a "Senior Director, Health Outcomes Value Assessment" at Pacira.[67] In that role, Preciado "led the development of research and quality improvement programs" and "research partnerships with key global, national, and regional health care executives across the medical device industry."[68] She also "regularly provides updates to senior management at Pacira, for whom she is authorized to fill in during both internal and external meetings."[69]

---

[64] *Id.* ¶ 126.

[65] *Id.* ¶127; *see* Ex. F.

[66] Ex. F. ¶ 6. The Consulting Agreement is governed by New Jersey law. *Id.* ¶ 13.

[67] Compl. ¶ 31.

[68] *Id.* ¶ 132.

[69] *Id.*

Still joined what the Complaint describes as a three-person "Advisory Committee" to Fortis.[70] Still held no formal position at Pacira or Pacira CryoTech after the Merger.[71] Plaintiffs allege that, notwithstanding this fact, "Still sent multiple messages to former MyoScience employees who had transitioned to working for Pacira, demanding concrete action to reach various milestone goals."[72] In particular, Plaintiffs point to a May 1, 2019, email from Kumar to Still and Andrew Jones, a former MyoScience employee who had remained at Pacira CryoTech after the Merger, asking Jones for "the exact language in our final purchase agreement on the reimbursement mile stones."[73] In the email, Kumar stated that his "primary focus" would be to achieve "just that."[74] Plaintiffs maintain that this comment shows that the Individual Defendants sought to implement a strategy of achieving "the minimum threshold necessary to trigger the CMS Reimbursement Milestones."[75]

---

[70] *Id.* ¶ 122. The Merger Agreement provides for an "Advisory Group" to "provide direction to the Securityholders' Representative in connection with its services" under the Merger Agreement. Merger Ag't. § 5.4(b).

[71] Compl. ¶¶ 123, 141.

[72] *Id.* ¶ 140.

[73] *Id.* ¶ 163; *see id.* ¶ 258.

[74] *Id.* ¶ 164.

[75] *Id.* ¶ 165.

16

## 2. The Individual Defendants Coordinate After CMS Publishes Draft Reimbursement Rates and Fortis Hires Daubert

On July 29, 2019, CMS released the draft reimbursement rates for CPT Code 64xx1.[76] Plaintiffs allege that "[e]ach of those draft rates failed to meet the threshold for triggering the CMS Reimbursement Milestone."[77]

The release of the draft reimbursement rates prompted the Individual Defendants to commence what Plaintiffs describe as a coordinated campaign to ensure the final rates, when published, would trigger the CMS Reimbursement Milestones.[78] On July 29, "Kumar provided Still with internal Pacira correspondence containing a Pacira consultant's preliminary assessment of the draft reimbursement rates."[79] The Individual Defendants then exchanged "numerous emails" and agreed to "get clarity" and "find out" additional information.[80] Also on July 29, 2019, Still emailed Gail Daubert, MyoScience's former outside counsel, stating, "I might need to consider engaging your expertise" on the draft reimbursement rates for CPT Code 64xx1.[81] Daubert wrote to Still that her acting

---

[76] *Id.* ¶ 167.

[77] *Id.*

[78] *Id.* ¶ 174.

[79] *Id.* ¶ 173.

[80] *Id.*

[81] *Id.* ¶ 194.

17

on behalf of the MyoScience Securityholders "would be adverse to Pacira."[82] Shortly thereafter, Still formally retained Daubert "on behalf of the Individual Defendants"[83] to persuade CMS and the AMA to "adjust the reimbursement rates applicable to CPT Code 64xx1."[84] There is no allegation that, at the time of her email exchange with Still, Daubert had been employed or retained by Pacira or Pacira CryoTech in any capacity.

At roughly the same time, Pacira began to formulate its own response to the draft reimbursement rates using Pacira's pre-merger reimbursement counsel, Latham & Watkins LLP ("Latham").[85] Unbeknownst to Pacira, Kumar and Preciado sent Still a number of updates on Pacira's internal discussions and shared documents that the Complaint alleges were confidential.[86]

- On July 30, 2019, Kumar "forwarded to Still an email with Pacira's General Counsel concerning the draft reimbursement rate for CPT code 64xx1" that had been intended for Latham.[87]

---

[82] *Id.* ¶ 195. Still disagreed with this statement, responding "[n]o." *Id.*

[83] *Id.* ¶¶ 197.

[84] *Id.* ¶¶ 199.

[85] *See id.* ¶ 174 (referencing email from Pacira's General Counsel to Latham concerning the draft reimbursement rate).

[86] *Id.* ¶¶ 174–88.

[87] *Id.* ¶ 174.

- On August 1, 2019, Kumar sent Still "an email reflecting information provided to Pacira by Latham."[88] The message reflected "Latham's impressions and advice regarding reimbursement procedures under CPT Code 64xx1 and the reimbursement calculations proposed by CMS."[89]

- On August 5, 2019, Preciado participated in a call with Pacira's General Counsel and Latham regarding the draft reimbursement rates that she secretly recorded.[90] After the call, Preciado sent Kumar a file entitled "Call with Latham Watkins re:646XX1 - 2019-8-5.m4a" from her personal email account.[91] Kumar then sent Still a "[s]ummary of our discussion today with Latham & Watkins" for "[his] records."[92]

- On August 6, 2019, Preciado forwarded to Still a draft letter Pacira had planned to send to CMS regarding the draft reimbursement rates for CPT Code 64xx1.[93] The Complaint does not describe the contents of the letter and neither party has entered the document into the record.

---

[88] *Id.*

[89] *Id.*

[90] *Id.* ¶¶ 181–82.

[91] *Id.* ¶ 182.

[92] *Id.* ¶ 186.

[93] *Id.* ¶ 174.

- On August 10, 2019, Kumar sent Still "an email reflecting competitive intelligence that Pacira had gathered about industry competitors, including potential actions those competitors might take during the CMS comment period."[94]

Still also sought to enlist Pacira's support. On August 22, 2019, Still sent an "unsolicited" email to Pacira's CEO Dave Stack, listing "all the steps that he would take, if he were in Stack's position, to influence the draft reimbursement rates."[95] Still told Stack that MyoScience had worked with Daubert in the past and had "been successful in the past with sending a memo; scheduling a phone call; and getting clarification where AMA and CMS had misread / misinterpreted information regarding iovera."[96]

On August 28, 2019, Pacira's General Counsel emailed Daubert asking if she would "join the team" that was "formulating [Pacira's] response to the iovera CM[S] reimbursement proposed rule."[97] Daubert declined, telling Pacira that "we have a conflict."[98] Plaintiffs contend that "Still's retention of Daubert led to significant increased costs, inefficiencies, and duplicative work" because Pacira would not have

---

[94] *Id*.

[95] *Id*. ¶ 170 (emphasis omitted).

[96] *Id.*

[97] *Id.* ¶ 205.

[98] *Id.* ¶ 207.

20

had to perform certain work that Daubert had already completed for MyoScience before the merger if Pacira had been able to hire Daubert.[99]

### 3. CMS Publishes Final Reimbursement Rates and Fortis Makes Demands for Milestone Payments

On November 1, 2019, CMS finalized CPT Code 64xx1 as CPT Code 64624 and published the final reimbursement rates.[100] CMS set the following reimbursement rates:

- $417.56 for procedures that used CPT Code 64624 in the office setting, compared to a CMS Milestone threshold of $600;

- $471.33 for procedures that used CPT Code 64624 in an ambulatory surgery center setting, compared to a CMS Milestone threshold of $800; and

- $1,872.01 for procedures that used CPT Code 64624 in an out-patient hospital setting, compared to a CMS Milestone threshold of 1,400.00.[101]

On January 3, 2020, Pacira sent Fortis a letter stating that the CMS Milestone set forth in Section 1.15(a)(iv)(3) of the Merger Agreement (tied to "reimbursement . . . in an out-patient hospital setting") had been satisfied and that it would pay the

---

[99] *Id.* ¶ 208.
[100] *Id.* ¶¶ 155, 210, 214–15.
[101] *Id.* ¶¶ 215–16.

MyoScience Securityholders $10 million on June 1, 2020.[102]  Pacira made that payment on May 27, 2020.[103]

On May 29, 2020, Fortis sent Pacira a letter demanding $40 million in Milestone Payments under both Section 1.15(a)(iv)(1) (tied to "reimbursement . . . in the office setting") and Section 1.15(a)(iv)(2) (tied to "reimbursement . . . in the ambulatory surgery centers setting").[104]  The letter demanded a response within one week.[105]  In the letter, Fortis asserted that, with respect to the 1.15(a)(iv)(1) milestone, "where a Smart Tip procedure destroys three nerves (other than the genicular nerve) in a single procedure . . . and is billed under CPT Code 64640, the payment for that procedure will exceed the $600 milestone threshold in many localities."[106]  Fortis also contended that the local reimbursement rates for "CPT code 64625 or 64635," "CPT code 64640," "CPT 64635 and 64636," or "CPT 64633 + 64634 + 64634" satisfied the Milestone Payment thresholds, justifying its demand for payment.[107]

---

[102] *Id.* ¶ 217.

[103] *Id.* ¶ 218.

[104] *Id.* ¶ 222.

[105] *Id.*

[106] Fortis Opening Br. Ex. 3; *see also* Compl. ¶ 226.

[107] Compl. ¶ 229.

Attorneys for Pacira responded to Fortis on June 5, 2020, asserting that "neither of the requested milestone payments is warranted" under Section 1.15(a)(iv)(1) or 1.15(a)(iv)(2) of the Merger Agreement.[108] On June 8, 2020, Fortis responded, stating that its "reimbursement experts" were "putting together a package of background data" that was "supportive of the many ways we have identified in which the milestones were reached."[109]

Plaintiffs allege that Fortis made this and other demands in bad faith.[110] In support of that position, Plaintiffs cite to a November 4, 2019 email to Still from Chris Anson, the Director of M&A at Fortis, stating: "I agree that it makes sense to use the ambiguous language to pressure them to pay quickly (and I will do so)."[111] Plaintiffs aver the reference to ambiguous language refers to the provisions in the Merger Agreement governing the Milestone Payments.[112]

Since the closing of the Merger, Pacira has made three Milestone Payments to the Escrow Participants.[113] The first, $7 million for satisfaction of the Regulatory Milestone involving CE Markings in Section l.15(a)(i)(1), occurred in November

---

[108]*Id.* ¶ 233.

[109] *Id.* ¶ 236.

[110] *Id.* ¶¶ 147, 156–57, 261–62.

[111] *Id.* ¶ 148 (emphasis omitted).  In the Complaint, Anson's name is misspelled as "Anon."

[112] Pls.' Ans. Br. 32.

[113]Compl. ¶ 152.

23

2019 following a back-and-forth between Pacira and Fortis's legal counsel about whether the milestone had been met in the second or third quarter of that year.[114] Pacira alleges that this initial disagreement evinced Still and Fortis's willingness to make bad faith payment demands without any justification.[115] The second Milestone Payment of $5 million occurred in either February or March 2020 after Pacira obtained approval to use iovera in Canada, as set forth in Section 1.15(a)(i)(2).[116] The third milestone payment, $10 million for the satisfaction of the CMS Reimbursement Milestone in Section 1.15(a)(iv)(3), occurred in May 2020 as described above.[117]

## G. Procedural History

On August 21, 2020, Plaintiffs filed their Complaint.[118] The Individual Defendants have moved to dismiss the Complaint in its entirety and Fortis has moved to dismiss Count III.[119] After briefing on the motions, the court heard oral argument on June 3, 2021.

---

[114] *Id.* ¶¶ 143–46;  Merger Ag't. § 1.15(a)(i)(1).

[115] Compl. ¶¶ 144, 147.

[116] *Compare id.* ¶ 150 (stating the payment was made on March 2, 2020), *with id.* ¶ 152 (stating that Pacira made payments in November 2019, February 2020, and May 2020).

[117] *Id.*  ¶¶ 151, 217, 221.

[118] Dkt. 1.

[119] Dkt. 13, 14.  Fortis filed its Answer and Verified Counterclaim on October 5, 2020, alleging that Pacira breached the Merger Agreement and owes the Escrow Participants $40 million in Milestone Payments.  Dkt. 12.

## II. ANALYSIS

The Complaint contains seven counts. Count I seeks a declaratory judgment that the MyoScience Securityholders are not entitled to Milestone Payments under Sections 1.15(a)(iv)(1) or 1.15(a)(iv)(2) of the Merger Agreement. Count II asserts that the Individual Defendants breached the Option Holder Letter. Count III is a claim for breach of the implied covenant of good faith and fair dealing against Fortis and the Individual Defendants. Count IV alleges that Kumar breached the Consulting Agreement. Count V alleges Kumar breached his fiduciary duties. Count VI alleges Preciado breached her fiduciary duties. Count VII alleges Still aided and abetted Kumar and Preciado in breaching their fiduciary duties.

### A. Standard of Review

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (cleaned up). Although the pleading standards are minimal, *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011), "a trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint'

25

and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

## B. Alleged Breach of the Option Holder Letter

Count II alleges that each of the Individual Defendants breached the Option Holder Letter by violating Section 1.15(e) of the Merger Agreement. The parties do not dispute that the Option Holder Letter incorporates Section 1.15(e). Section 1.15(e)(i) (the "Exclusive Right Provision") provides that the "sole and exclusive right of the Escrow Participants under this Section 1.15 will be to receive, subject to the other terms of this Agreement, the Milestone Payments payable pursuant to this Section 1.15." Section 1.15(e)(ii) (the "Sole Discretion Provision") provides that Pacira "will have the right to operate the business of [Pacira CryoTech] as it chooses, in its sole discretion, except as expressly set forth in this Section 1.15." Plaintiffs fuse these provisions to impose contractual obligations upon the Individual Defendants.

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether

express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Plaintiffs argue the Merger Agreement (through the Option Holder Letter) imposes an obligation on the Individual Defendants to refrain from interfering in Pacira's internal affairs or operations. The Merger Agreement does not provide for such an express obligation. Plaintiffs derive that obligation, however, from the Sole Discretion Provision, which they claim gives Pacira "the exclusive right to operate Pacira CryoTech free from interference,"[120] and the Exclusive Right Provision, which Plaintiffs assert imposes on the Individual Defendants an obligation to "limit their post-merger role to potentially receiving milestone payments."[121] According to Plaintiffs, the Individual Defendants breached this obligation in two ways. First, they attempted to "influence and instruct"[122] Pacira CryoTech employees to achieve the "minimum threshold necessary to trigger the CMS Reimbursement Milestones."[123] Second, the Individual Defendants "prevented Pacira from working with Gail Daubert" by retaining her first.[124] Plaintiffs allege that Pacira suffered

---

[120] Pls.' Ans. Br. 15–16.

[121] *Id.* at 49.

[122] Compl. ¶ 258.

[123] *Id.* ¶ 165.

[124] *Id.* ¶ 258.

27

damages "including, but not limited to, the deprivation of Pacira's negotiated contractual rights, the loss of valuable, confidential information, and the time and money Pacira has been forced to expend due to the Individual Defendants' retention of Daubert."[125]

The Individual Defendants respond that Section 1.15(e) "does not impose any obligations on Individual Defendants or prohibit them from taking any action."[126] Section 1.15(e), on their reading, serves instead as a "disclaimer of any obligation" by Pacira to "make payments to the former MyoScience securityholders under Section 1.15 other than the Milestone Payments if they are achieved or . . . [to] operate the company in a specific way following the Merger except as otherwise set forth in Section 1.15."[127]

Where, as here, the meaning of a contract is in dispute, the court must "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotations omitted). In doing so, the court must read a contract so as not to render any part of the contract "mere surplusage," *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393,

---

[125] *Id.* ¶ 296.

[126] Indiv. Defs.' Opening Br. 36.

[127] *Id.* at 34–35.

396–97 (Del. 2010), or "illusory or meaningless." *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 287 (Del. 2001). The court must also "interpret clear and unambiguous terms according to their ordinary meaning." *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 335 (Del. 2012). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Plaintiffs argue that "[o]n its face, Section 1.15(e) imposes a clear obligation on the Escrow Participants."[128] As evidence for this proposition, Plaintiffs cite to the Exclusive Right Provision. This argument ignores the plain language of Section 1.15(e). Nowhere does that section use the term "obligation" with respect to the Escrow Participants. The only pertinent reference in Section 1.15(e) to any obligation concerns *Pacira*:

> [MyoScience] and the Securityholders' Representative on behalf of each Escrow Participant acknowledge and agree that, without limiting the provisions and obligations of [MyoScience] in this Section 1.15 . . . [Pacira] is not under any obligation to provide any specific level of investment or financial assistance to the Surviving Corporation or to undertake any specific actions (or to refrain from taking any specific actions) with respect to the

---

[128] Pls.' Ans. Br. 50.

29

operation of the Surviving Corporation, except as expressly set forth in this Section 1.15.[129]

Plaintiffs also fail to explain how a reference to the Escrow Participants' "sole and exclusive" *right* to receive the Milestone Payments could reasonably be read as imposing an affirmative *obligation* on them. Because the agreement does not contain any language demonstrating that the parties intended to impose obligations on the Escrow Holders, I conclude that Section 1.15(e) of the Merger Agreement unambiguously does not impose any obligation on the Individual Defendants.

Read within the context of the other provisions of Section 1.15, the Sole Discretion Provision defines the scope of Pacira's obligations to make Milestone Payments to the Escrow Holders under the Merger Agreement's Milestone Payment provisions in Section 1.15(a). Section 1.15(d) provides that Pacira "shall operate [Pacira CryoTech] in good faith in the context of this Section 1.15 and shall use commercially reasonable efforts to achieve the Milestones."[130] Further refining Pacira's specific obligations, Section 1.15(e)(iii) states that Pacira need not "provide any specific level of investment or financial assistance" to Pacira CryoTech to achieve the milestones or to "undertake any specific actions (or to refrain from taking any specific actions) with respect to [its] operation."

[129] Merger Ag't. § 1.15(e).

[130] For a detailed discussion of efforts clauses, see *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *85–86 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).

Section 1.15(e) operates as a disclaimer of Pacira's obligations to engage in any conduct beyond that specified in the Merger Agreement. As this court has noted when interpreting a similar provision giving the purchaser "sole discretion with regard to all matters relating to the operation of the Business," these provisions "set a contractual standard by which to evaluate whether [the buyer's] failure to achieve and pay [the] Milestones was improper." *Himawan v. Cephalon*, 2018 WL 6822708, at *8 (Del. Ch. Dec. 28, 2018) ("paraphras[ing]" *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *5 (Del. Ch. Jan. 30, 2015)); *see also, e.g.*, *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *2, *14 (Del. Ch. Feb. 27, 2021) (earn-out provision gave buyer the "sole discretion and authority post-closing to make decisions concerning all matters relating to [the acquired product]" provided it used commercially reasonable efforts to achieve a CE marking milestone (internal quotations omitted)); *Lazard Tech. P'rs., LLC v. Qinetiq N. Am. Operations LLC*, 114 A.3d 193, 196 (Del. 2015) (earn-out provision "left the buyer free to conduct its business post-closing in any way it chose so long as it did not act with the intent to reduce or limit the earn-out payment"); *ev3, Inc. v. Lesh*, 114 A.3d 527, 528 (Del. 2014) (earn-out provision imposed obligation on buyer to fund and pursue certain regulatory milestones in its "sole discretion, to be exercised in good faith").

31

The Plaintiffs ask this court to read the Sole Discretion Provision as imposing an obligation on the Escrow Holders to refrain from making any efforts to communicate with Pacira employees or the authorities that determine reimbursement rates which affect the calculation of the Milestone Payments. Plaintiffs cite no case where the court read a similar provision as imposing the obligation Plaintiffs seek to impose here. If that is what the parties had intended, they could have easily provided for such an obligation in the Merger Agreement or the Option Holder Letter. Section 1.15(e) demonstrates that the parties knew how to specify whether a party is required "to refrain from taking any specific actions" in the post-closing operations of the business.[131] Likewise, the parties' use of the phrase "shall" in Section 1.15(d) to impose legal obligations on *Pacira* indicates that, had the parties intended to impose an obligation on the Individual Defendants, they would have used the same construction.[132] "[A]s a matter of contractual interpretation, [courts] should refrain from writing a provision into a contract when the parties could have done so themselves, but chose not to." *Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*, 2019 WL 1223026, at *21 (Del. Ch. Mar. 14, 2019). Absent any reference to the

---

[131] Merger Ag't. § 1.15(e)(iii) ("Parent is not under any obligation to provide any specific level of investment or financial assistance to the Surviving Corporation or to undertake any specific actions (or to refrain from taking any specific actions) with respect to the operation of the Surviving Corporation, except as expressly set forth in this Section 1.15.").

[132] *Id.* § 1.15(d) ("Following the Closing and for the duration of the Milestone Achievement Period, Parent shall operate the Surviving Corporation in good faith in the context of this Section 1.15 and shall use commercially reasonable efforts to achieve the Milestones.").

obligations of the Escrow Holders, the plain meaning of Section 1.15 is not susceptible to the Plaintiffs' interpretation.

Because Section 1.15(e) plainly does not impose any obligation on the Individual Defendants, the Plaintiffs have failed to specify an obligation that the Individual Defendants breached. Count II is accordingly dismissed for failure to state a claim.

### C. Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Count III alleges that Fortis and the "MyoScience stockholders, through Fortis Advisors" violated an implied covenant that Fortis "would only make proper, good-faith demands for payments under the Merger Agreement's milestone provisions."[133] The Complaint further alleges that Fortis and the Individual Defendants have breached the implied covenant of good faith and fair dealing by engaging "in conduct intended to frustrate Pacira's rights to receive the full benefits of the Merger Agreement by making demands for Milestone Payments, that are not, in fact, due."[134]

The implied covenant of good faith and fair dealing "attaches to every contract by operation of law," *Metro. Life Ins. Co. v. Tremont Grp. Hldgs, Inc.*, 2012 WL

---

[133] Compl. ¶ 261.

[134] *Id.* ¶ 263.

33

6632681, at \*15 (Del. Ch. Dec. 12, 2012), and is "best understood as a way of implying terms in the agreement." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996). The doctrine "ensures that the parties deal honestly and fairly with each other when addressing gaps in their agreement." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021). It requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotations omitted).

The doctrine most often "comes into play in two situations": (1) "when it is argued that a situation has arisen that was unforeseen by the parties and where the agreement's express terms do not cover what should happen" or (2) "when a party to the contract is given discretion to act as to a certain subject and it is argued that the discretion has been used in a way that is impliedly proscribed by the contract's express terms." *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 504 n.93 (Del. 2019).

"In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, 1998 WL 842316, at \*1 (Del. Ch. Nov. 10, 1998). "When

34

presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch. 2014). "During this phase, the court decides whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *Id.* "[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Glaxo Grp. Ltd.*, 248 A.3d at 920. Put differently, the court may not use the doctrine to recognize any obligations that "negate an unrestricted contractual right authorized by an agreement" or prohibit conduct that the contract authorizes. *Id.* at 921.

"Even where the contract is silent as to the conduct in question, an interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Oxbow*, 202 A.3d at 507 (cleaned up). Doing so would give the parties "contractual protections that they failed to secure for themselves at the bargaining table." *El Paso Pipeline*, 113 A.3d at 183–84 (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004)). Permissible considerations at this stage include, for example, whether the "expectations of the parties were so

35

fundamental that it is clear that they did not feel a need to negotiate about them," *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006), or whether the gap arises due to reasonably unforeseeable contingencies. *El Paso Pipeline*, 113 A.3d at 184 (noting that "[e]ven the most skilled and sophisticated parties will necessarily fail to address a future state of the world") (cleaned up).

"Assuming a gap exists and the court determines that it should be filled, the court must determine how to fill it." *Id.* At this stage, the court "seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013). Because "a court can only imply a contractual obligation when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation." *Fitzgerald*, 1998 WL 842316, at *1. The court "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract [s]he now believes to have been a bad deal." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

Proving breach of the implied claim "does not depend on the breaching party's mental state." *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing*

36

*Member, LLC,* 50 A.3d 434, 442 (Del. Ch. 2012), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013). The implied covenant therefore "does not require that a party [to] have acted in subjective good faith." *El Paso Pipeline*, 113 A.3d at 183.

### 1. Bad Faith Claim Against Fortis for Improper Demands

Plaintiffs argue that the Complaint states a claim for breach of the implied covenant because: (1) Fortis had an obligation to refrain from making "premature, bad-faith, and/or baseless demands" for payment under the Merger Agreement;[135] (2) Fortis violated that obligation by making such demands;[136] and (3) Pacira suffered damages because it was denied the "full benefits"[137] of the Merger Agreement and because it had to "expend resources" to respond to such demands.[138]

Plaintiffs advance two broad points to support this claim. First, they argue the Merger Agreement contains a "gap" regarding payment demands from Fortis as the Securityholders' Representative insofar as the "parties did not contract for Fortis to submit demands for payment" and "did not appear even to have contemplated that possibility."[139] Second, Plaintiffs urge the court to fill that gap with an implied

---

[135] Compl. ¶ 262; *see id.* ¶ 261.

[136] *Id.* ¶ 262.

[137] *Id.* ¶ 263; *see id.* ¶ 267.

[138] *Id.* ¶ 268.

[139] Pls.' Ans. Br. 21–22.

37

prohibition against the making of "bad-faith payment demands" because Pacira will otherwise be denied "numerous post-merger benefits."[140]

The Plaintiffs' argument fails at step one of the implied covenant analysis because the Merger Agreement addresses the issue of demands from the Securityholders' Representative. There is no gap. Plaintiffs *did* contract for specific circumstances in which Fortis is entitled to make demands of Pacira related to the satisfaction of milestones, and to which Pacira has an obligation to respond. Section 1.15(f) of the Merger Agreement expressly provides that, "in the event of a dispute with respect to any audit conducted or report provided under Section 1.15(f)" the Securityholders' Representative "shall deliver an objection notice" to Pacira.[141] Section 1.15(f) also requires both parties to "work in good faith to resolve" the disagreement and provides that, if the parties fail to reach agreement, they shall submit their dispute to a mutually agreed upon accounting firm for resolution.[142] Section 1.15(f) also imposes an express limitation on Fortis's ability to lodge objections under Section 1.15—"in no event shall the Securityholders'

---

[140] *Id.* at 29; *see id.* at 18–19.

[141] Merger Ag't § 1.15(f)(ii).

[142] *Id.*

38

Representative be entitled to submit a Milestone Objection Notice more than once in any fiscal year."[143]

Plaintiffs argue that Section 1.15(f) addresses a different subject matter—not payment demands, but milestone reports—and is limited to a narrow range of disputes involving "audits" of financial information.[144] But that point only serves to undermine Plaintiffs' argument. Plaintiffs' argument thus concedes that the parties contracted for specific circumstances in which Fortis's ability to make demands of Pacira is circumscribed. And they did so in the narrow context of Fortis demanding financial information from Pacira to confirm whether certain milestones involving "calculations" and "measurements" have been satisfied. What follows from this is not that the contract contains a gap regarding Fortis's demands in all other circumstances. To the contrary, it confirms both that the parties agreed to place no restrictions on the ability of Fortis to make demands for payment from Pacira and, correspondingly, placed no obligation on Pacira to respond to any such demands.[145]

---

[143] *Id*. In addition, Section 1.15(f)(i) expressly provides that "no more than once per fiscal year" the Securityholders' Representative shall have the right to access "the financial books and records of Parent to the extent relating to the achievement or non-achievement of the Milestones." Merger Ag't § 1.15(f)(i). It also provides that, under certain circumstances, "Parent may restrict the foregoing access" in the exercise of its "good faith, reasonable judgment." *Id.*

[144] Pls.' Ans. Br. 22–23.

[145] Plaintiffs offer no authority for their assertion that the absence of any provision addressing unsolicited payment demands "suggests, at a minimum, that they are disfavored, if not outright disallowed." Pls.' Ans. Br. 24. Using the implied covenant to

39

That is particularly apt here. "We do not ordinarily speak of one's entitlement to make a demand of any sort; demands are simply made and, once they are made, the question is not whether one was entitled to make the demand, but whether there is a legal obligation to comply with it." *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1240 (Del. Ch. 1987). The existence of Section 1.15(f) demonstrates that had the parties wanted to curtail or restrain Fortis's ability to make the types of demands for payment about which Pacira now complains, the contract "could easily have been drafted to expressly provide for it." *Oxbow*, 202 A.3d at 507.

Plaintiffs respond that the parties failed to provide for a prohibition against bad faith demands not because they intended to leave all demands outside of the narrow context of Section 1.15(f) unregulated, but rather because such a prohibition was "too obvious to need expression."[146] In support of that proposition, Plaintiffs point to what they extol as "clear Delaware precedent"[147]—a bench ruling by then-Vice Chancellor Strine in *HCP CH1 Saddle River, LLC v. Sunrise Senior Living*

---

create such a rule would "create a free-floating [negative] duty . . . unattached to the underlying legal document." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).

[146] Pls.' Ans. Br. 26 (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 368 (Del. 2017)).

[147] *Id.* at 20.

*Services, Inc.*, C.A. No. 4691-VCS (Del. Ch. Dec. 9, 2009) (TRANSCRIPT) ("*Saddle River*").

Setting aside Plaintiffs' assertion that a transcript ruling is "clear Delaware precedent,"[148] *Saddle River* does not support the Plaintiffs' argument. In *Saddle River*, the counterclaim-defendant, "HCP", acquired a portfolio of senior living facilities operated by counterclaim-plaintiff, "Sunrise", pursuant to certain management agreements.[149] HCP tried to renegotiate the agreements but Sunrise resisted.[150] HCP then tried to pressure Sunrise to renegotiate the agreements by exercising certain discretionary contractual rights in a manner that Sunrise alleged was oppressive—such as serial demands for audits and other irrelevant information.[151] In denying a motion to dismiss an implied covenant claim alleging that HCP had "repeatedly made demands of Sunrise in bad faith,"[152] the court held that Sunrise had sufficiently pleaded that "HCP used its contractual discretion in bad faith by engaging in harassing conduct designed to put financial and other kinds of pressure on Sunrise to renegotiate." *Saddle River*, C.A. No. 4691-VCS Hrg. Tr. at

---

[148] *Cf. Day v. Diligence, Inc.*, 2020 WL 2214377, at *1 (Del. Ch. May 7, 2020) ("Transcript Rulings generally have *no* precedential value in this Court and they should ordinarily not be relied on as precedent—at most they offer persuasive authority.").

[149] *Saddle River*, C.A. No. 4691-VCS (Dkt. 44 (Ans. & Verified Countercl.) ¶¶ 1–4).

[150] *Id.* ¶¶ 5, 15.

[151] *Id.* ¶¶ 8–9, 18–19, 24, 28, 35–36.

[152] *Id.* ¶ 35.

55:7–10. The court made clear that the violation of the implied covenant claim concerned HCP's abuse of its "contractual power." *Id.* at 11:16–21; *see id.* at 12:2–6 ("THE COURT: . . . They point to the provisions of the contract that deal with these things, and, *yeah, they have a right to ask for information, they* don't have a right to change their mind a million times, basically to do it pretexturally [sic] just to drive us crazy." (emphasis added)).

Unlike in *Saddle River*, where the counterclaim defendant had express, unconditional contractual rights to seek books and records and discretionary rights to refuse to approve the counterclaim plaintiff's operating budget and capital expenditures, the Merger Agreement here does not require Pacira to respond to any unsolicited communication from Fortis outside the limited context of Section 1.15(f). In *Saddle River*, the express contractual rights were the necessary factual predicate for the implied obligation not to exercise those rights in a harassing manner with the aim of depriving the counterparty of its contract rights. Here, by contrast, Pacira has no obligation to respond to any of Fortis's demands until *after* Pacira sends Fortis a written report pursuant to Section 1.15(f). Because Fortis's demands for milestone payments were not in response to a written report pursuant to Section 1.15(f)(i), Pacira was free to dismiss any requests related to the CMS Milestones out

42

of hand.[153] *Saddle River* is thus consistent with well-established authority that "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith." *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del. Ch. 2009); *see id.* at 147 n.1 (collecting authorities).[154]

In any event, Plaintiffs have failed to plead sufficient facts to show that the communications sent to Pacira by Fortis or by Still on behalf of Fortis constituted harassment or "oppressive or underhanded tactics." *Chamison v. HealthTrust-Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999); *see id.* at 920–23 (noting that defendant HealthTrust, Inc. acted oppressively by refusing to "pay the reasonable fees and expenses of [defense] counsel selected by [HealthTrust]" pursuant to an indemnification provision by demanding that plaintiff Chamison accept an attorney who "contemplated a group defense strategy that ignored Chamison's unique

---

[153] Merger Ag't § 1.15(f)(i). Plaintiffs likewise have not alleged or argued that Pacira had a contractual obligation to respond to any of what Pacira characterizes as Fortis's allegedly "premature, bad-faith, and/or baseless demands" made between April and August 2019. Compl. ¶¶ 144, 261.

[154] *Compare Travel Servs. Network, Inc. v. Presidential Fin. Corp. of Mass.*, 959 F.Supp. 135, 141 (D. Conn. 1997) (observing that "Massachusetts courts have left open the possibility that in certain circumstances lenders may violate the implied covenant by the *manner* in which they exercise express contractual rights" (emphasis in original)), *with CSL Behring, LLC v. Bayer Healthcare, LLC*, 2019 WL 4451368, at *4 (D. Del. Sept. 17, 2019) ("A defendant does not violate the implied covenant of good faith and fair dealing merely by acting in its own self-interest while also performing its express obligations under the contract." (applying New York law) (internal quotations omitted)).

43

defenses" (emphasis omitted)), *aff'd*, 748 A.2d 407 (Del. 2000). Nor have Plaintiffs alleged that Fortis's demands for Milestone Payments were a pretext for some other purpose. *Cf. Saddle River*, C.A. 4691-VCS Hrg. Tr. at 12:2–6 (describing claim that demands were made pretextually).

The Complaint describes four separate instances of correspondence directed at Pacira by or on behalf of Fortis. While the Complaint asserts that counsel for the Securityholders' Representative, Davis Malm, sent Pacira "multiple emails and letters to Pacira between April and August 2019 prematurely demanding payment"[155] related to one of the Regulatory Milestones not at issue here, the Complaint cites just two. The first is an August 26, 2019 email stating that Fortis "expects to receive payment for the Milestone on Friday, August 30, 2019."[156] The second is an August 28, 2019 email stating that "[a] failure to receive a CMS reimbursement in 2020 is by all means unacceptable."[157]

With respect to the CMS Milestone Payments, Plaintiffs point to two letters from Fortis—a May 29, 2020 letter requesting that Pacira "inform [the MyoScience Securityholders] of the plans for the payment of $40 million within one week"[158] and a June 8, 2020 reply to Pacria's response letter, expressing "confiden[ce] . . .

---

[155] Compl. ¶ 144.

[156] *Id.* ¶ 145.

[157] *Id.* ¶ 154.

[158] *Id.* ¶ 222.

44

that all of the codes identified can be used for procedures using iovera, and that they include codes under which iovera procedures were billed in the past."[159]

These emails are non-threatening business communications. Even when the two emails from 2019 are considered in connection with Fortis's 2020 demand letters related to the CMS Milestone Payments—sent *ten months later*—these communications fall far short of a "conscious, persistent campaign to put pressure on somebody to renegotiate by making their life hellacious." *Saddle River* at 10:6–8. "Despite the appearance in its name of the terms 'good faith' and 'fair dealing,' the covenant does not establish a free-floating requirement that a party act in some morally commendable sense . . . [n]or does satisfying the implied covenant necessarily require that a party have acted in subjective good faith." *El Paso Pipeline*, 113 A.3d at 182–83 (internal citations omitted).

Plaintiffs' other argument, that these emails constitute "bad faith" because Fortis understood them to be baseless, is itself without merit. Plaintiffs' only ground for that assertion is an excerpt from a November 4, 2019 email to (not from) Still from Chris Anson, the Director of M&A at Fortis, expressing an intent to use "ambiguous language [in the Merger Agreement] to pressure [Pacira] to pay

---

[159] *Id.* ¶ 235.

[milestone payments] quickly."[160]  Plaintiffs offer no context for the email.[161]  Even if I draw the inference that Anson was referring to the CMS Regulatory Milestone payments in light of CMS's publication of the finalized reimbursement rates on November 1, 2019, the statement fails to establish that Anson or Still understood Fortis's demands to be baseless.  At most, it shows that they understood the contract to be susceptible to multiple meanings, some of which were more favorable to its position than others.  Fortis was and remains free to leverage perceived ambiguities in the contract to advance its positions—just as Plaintiffs have sought to do in this action.  *See ASB Allegiance,* 50 A.3d at 442 ("Proving a breach of contract claim does not depend on the breaching party's mental state.").

Plaintiffs have also failed to plead sufficient facts to support their assertion that Pacira was denied "multiple benefits of the bargain."[162]  Plaintiffs assert that Fortis denied Pacira the right to operate Pacira CryoTech "as it chooses, in its sole discretion."[163]  But Plaintiffs have failed to allege facts from which it can be reasonably inferred that any letters from Fortis demanding Milestone Payments

---

[160] Compl. ¶ 148.

[161] Aside from the language quoted, neither side to this action has submitted the email into the record on this motion.

[162] Pls.' Ans. Br. 27.

[163] *Id*. at 29.

under the Merger Agreement deprived Pacira of its ability to operate Pacira CryoTech as it chose or the benefits of the Merger.

For these reasons, the motion to dismiss Count III as to Fortis for failure to state a claim is granted in its entirety.

### 2. Improper Interference Claims

Plaintiffs separately argue that the Individual Defendants "frustrated Pacira's rights to receive the full benefits of the Merger Agreement" by "interfering in Pacira's relationships" and "denying Pacira the rights and privileges it acquired pursuant to Section 1.4 of the Merger Agreement."[164] Specifically, Plaintiffs argue that Individual Defendants have interfered in Pacira's internal affairs by "attempting to commandeer and misdirect Pacira employees."[165] Plaintiffs also contend that the "rights" and "privileges" Pacira obtained in Section 1.4 of the Merger Agreement includes an implied covenant protecting any "external relationships" that MyoScience had—specifically, the relationship with Daubert.[166] Plaintiffs then assert that this implied covenant extends to the Individual Defendants.

The Individual Defendants contend that they are not proper defendants for the implied covenant claims under the Merger Agreement because Fortis is the

---

[164] Compl. ¶ 264.

[165] Pls.' Ans. Br. 1.

[166] *Id.*

47

Securityholders' Representative and the only party against whom these claims can be asserted.[167] Plaintiffs argue, however, that their implied covenant claims can proceed against the Individual Defendants.[168] Plaintiffs rely on *Shareholder Representative Services, LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *6-7 (Del. Ch. May 22, 2019), where the court permitted unjust enrichment claims to proceed against a group of former stockholders who also had a designated stockholder representative representing their interests under the merger agreement. In that case, the court allowed the unjust enrichment claims to proceed against the individuals because the seller alleged that the contract itself was a product of fraud. Thus, the sellers sought to recover monies that the individuals had received from the merger in excess of the value of the company at the time the merger closed. *Id*. at *6. Unlike in *RSI Holdco*, Plaintiffs' implied covenant claim is based upon the terms of the Merger Agreement and assumes its validity.

Even if the claims could be asserted directly against the Individual Defendants, Plaintiffs have not identified a gap in the contract or to any "express terms of the contract" indicating that the parties would have agreed to impose

---

[167] Indiv. Defs.' Opening Br. 40 (citing *Fortis Advisors LLC v. Allergan W.C. Holding Inc.*, 2020 WL 2498068, at *3 (Del. Ch. May 14, 2020) ("The contractual appointment of a shareholder representative to bring certain actions makes that representative the real party in interest in those actions.")).

[168] Pls.' Ans. Br. 54–56.

obligations on the Individual Defendants to refrain from communicating with or recruiting Pacira's current or former employees. *Fitzgerald*, 1998 WL 842316 at *1. "[A] court should be cautious when implying a contractual obligation and do so only where obligations which can be understood from the text of the written agreement have nevertheless been omitted from the agreement in the literal sense." *Id.* If the parties had wanted to prohibit the selling stockholders from engaging with or soliciting information from Pacira or Pacira CryoTech employees, "the contract could easily have been drafted to expressly provide for it." *Oxbow*, 202 A.3d at 507.[169] Implying such a covenant would grant Plaintiffs contractual protections they "failed to secure for themselves at the bargaining table." *Aspen Advisors LLC*, 843 A.2d at 707.[170]

---

[169] *See, e.g.*, *EBP Lifestyle Brands Hldgs., Inc. v. Boulbain*, 2017 WL 3328363, at *2 (Del. Ch. Aug. 4, 2017) (describing non-compete covenant in Stockholders' Agreement prohibiting a stockholder and former employee from "directly or indirectly (i) solicit[ing] or induc[ing], or attempt[ing] to solicit or induce or assist any Person in soliciting or inducing any employee or sales representative of [EBP] or any subsidiary to leave the employ or engagement of [EBP] or such subsidiary, or in any way interfere with the relationship between [EBP] or any subsidiary and any such employee or sales representative thereof").

[170] *See* Angela C. Zambrano, Robert Velevis & Frank J. Favia Jr., *What Private Equity Sponsors Need to Know About an Implied Permanent Nonsolicitation Covenant Under New York Law*, WESTLAW TODAY, Mar. 16, 2020, Doc. No. 2020 PRINDBRF 0055 ("Noncompetition and nonsolicitation restrictive covenants are familiar tools often used in mergers and acquisitions to encourage retention of key employees of a sold business and to discourage the seller or key employees from poaching important customers or suppliers post-sale."); Krishna Veeraraghavan & Bradley S. King, *Considerations in Carve-Out Transactions*, THE M&A LAW., Nov./Dec. 2019, at 7 (noting that a "no-poach" or "non-

Nor can Plaintiffs rely on Section 1.4 to support their claim that Still's hiring of Daubert on behalf of Fortis violated the implied covenant. Section 1.4 of the Merger Agreement provides that, as a result of the Merger, "all the property, rights, privileges, powers and franchises of the Company and Merger Sub will vest in [Pacira CryoTech]" and the debts and liabilities of the Company and Merger Sub will become debts and liabilities of the Pacira CryoTech.[171] Section 1.4 is not among the provisions of the Merger Agreement to which the Individual Defendants became bound under Paragraph "a" of the Option Holder Letter. It does not impose any affirmative obligations on the Individual Defendants.

Even if the Individual Defendants had consented to Section 1.4, Plaintiffs have again failed to identify a gap in the Merger Agreement that would license the application of the implied covenant to prohibit Still's interactions with Daubert— whether in his individual capacity or on behalf of Fortis. Section 1.4 mirrors Section 259 of the Delaware General Corporation Law, which provides that following a merger, "all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation . . . ."[172] In interpreting the statute, this court has held that

---

solicitation" covenant is "[a]nother post-closing commitment commonly sought by buyers" in carve-out M&A transactions).

[171] Merger Ag't. § 1.4.

[172] 8 *Del. C.* § 259.

50

"attorney-client privilege—like all other privileges—passes to the surviving corporation in the merger as a matter of law." *Great Hill Equity P'rs. IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 159 (Del. Ch. 2013). Plaintiffs seek to transform Pacira's contracted-for right to privileged information obtained by Daubert over the course of her representation of MyoScience into an exclusive implied contractual right to prohibit Fortis from hiring Daubert when she was no longer engaged by MyoScience or Pacira. But Section 1.4 shows that the Merger Agreement already addresses that issue; the Merger Agreement provides for Pacira's right to the privileged information in Daubert's possession. Plaintiffs' effort to expand the terms "rights" and "privileges" in Section 1.4—a provision to which the Individual Defendants are not parties—to create an implied covenant claim against the Individual Defendants for retaining a former outside counsel to MyoScience is untenable. This court may not imply a valuable term that Plaintiffs failed to secure for themselves.[173] There is no gap in the contract to be filled.[174]

For the foregoing reasons, the motion to dismiss Count III for failure to state a claim against the Individual Defendants is granted in its entirety.

---

[173] *See* Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 18.07[4], at 18-44 (2021 ed.) ("Restrictive covenants such as non-competition and non-solicitation agreements are often valued elements of a corporate transaction.").

[174] Plaintiffs do not allege that Daubert violated, or that Still sought to induce Daubert to violate, her duty to safeguard Pacira CryoTech's privileged information.

**D. The Individual Defendants' Motion to Dismiss Claims for Breach of Contract, Breach of Fiduciary Duty, and Aiding and Abetting**

The Individual Defendants have moved to dismiss Counts IV, V, VI, and VII for lack of personal jurisdiction over each of the Individual Defendants.[175] None of the Individual Defendants is a Delaware resident, and the Complaint alleges no facts indicating they have had any contacts with Delaware.

**1. Motion to Dismiss for Lack of Personal Jurisdiction**

"On a motion to dismiss under Rule 12(b)(2), the plaintiff has the burden to show a basis for the court's jurisdiction over the nonresident defendant." *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *4 (Del. Ch. Sept. 2, 2008). "When evaluating whether plaintiffs have met their burden of showing a basis for jurisdiction over a nonresident defendant, Delaware courts invoke a two-prong test." *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018) (internal quotations omitted). "In the first step, the court must determine whether the plaintiff has identified a legally cognizable basis for asserting jurisdiction over the defendant. Typically this involves identifying and meeting the requirements of a statute, such as Delaware's long-arm statute. *Terramar Retail*

---

[175] In Section II of their Opening Brief, the Individual Defendants argued that they had not been served in compliance with 10 *Del. C.* § 3104. Indiv. Defs.' Opening Br. 27–30. On December 7, 2020, the Individual Defendants stipulated and agreed to accept service of the Complaint and withdrew all arguments in Section II. Dkt. 28. The stipulation and proposed order related to service of process was granted on the same day. Dkt. 29.

*Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D/ June 21, 2002*, 2017 WL 3575712, at *8 (Del. Ch. Aug. 18, 2017), *aff'd*, 184 A.3d 1290 (Del. 2018).[176]  Next, the Court must engage in a due process inquiry to determine whether the "nonresident defendant has sufficient minimum contacts with Delaware" so as to "reasonably anticipate being required to defend itself in Delaware's courts." *Eagle Force Hldgs.*, 187 A.3d at 1228 (cleaned up).  Yet "[w]here a party commits to the jurisdiction of a particular court or forum by contract, such as through a forum selection clause, a 'minimum contacts' analysis is not required as it should clearly anticipate being required to litigate in that forum." *Id.* (citations omitted).  In evaluating a motion to dismiss for lack of personal jurisdiction, the "court may consider the pleadings, affidavits, and any discovery of record." *EBG Hldgs.*, 2008 WL 4057745, at *4.  If "no evidentiary hearing has been held and discovery has not been taken, plaintiffs need only make a *prima facie* showing of personal jurisdiction, and the record will be construed in the light most favorable to the plaintiff." *Id.*

---

[176] If the Long Arm Statute does not permit the exercise of general jurisdiction over the defendant, then the Court must examine whether there is a "sufficient nexus" between the defendant's "forum-directed conduct and [each] claim being asserted." *Terramar Retail Ctrs., LLC*, 2017 WL 3575712, at *8.

## 2. The Scope of the Individual Defendants' Consent to Jurisdiction Under the Merger Agreement

Plaintiffs argue that this court has jurisdiction over the breach of fiduciary duty claims against Kumar and Preciado because they agreed, by signing the Option Holder Letter, to the exclusive forum provision in Section 9.7 of the Merger Agreement.[177] The Individual Defendants respond that they did not agree to be bound by Section 9.7 of the Merger Agreement, and even if they did, Counts IV-VII do not "arise out of the Merger Agreement or the matters contemplated [t]herein."[178]

Section 9.7 of the Merger Agreement provides, in pertinent part:

> Each Party irrevocably consents to the exclusive jurisdiction of . . . any state . . . court located in the state of Delaware in connection with any matter based upon or arising out of, or with respect to, this Agreement or the matters contemplated herein . . . .

The exclusive forum provision in Section 9.7 of the Merger Agreement does not, by its terms, apply to the Individual Defendants. That provision expressly applies to each "Party" to the Merger Agreement. None of the Individual Defendants is a Party to the Merger Agreement.

The Option Holder Letter binds the Individual Defendants to certain provisions of the Merger Agreement, but Section 9.7 is not one of them. Paragraph "a" of the Option Holder Letter provides that the Option Holder:

---

[177] Pls.' Ans. Br. 43–44.

[178] Indiv. Defs.' Opening Br. 22–23 (internal quotations omitted).

agrees to be bound by the terms and conditions of the Merger Agreement . . . applicable to "Escrow Participants" . . . in their capacities as such, as applicable to a holder of securities of the type held by the undersigned . . . including the following: Section 1.8 (Company Options, Section 1.11 (Merger Consideration); Section 1.12 (Merger Consideration Payments); Section 1.13 (Working Capital Adjustment Escrow; Indemnity Escrow), Section 1.14 (Post-Closing Adjustment to Merger Consideration), Section 1.15 (Milestone Consideration) . . . Article VIII (Certain Remedies) (and all defined terms used in any of the foregoing provisions and Article IX to the extent applicable thereto).[179]

***

The undersigned consents to the exclusive jurisdiction of the state and federal courts sitting in the State of Delaware and consents to personal jurisdiction of and venue in such courts with respect to any and all matters or disputes arising out of this [Option Holder Letter].[180]

Paragraph "a" binds the signatories to specific provisions of the Merger Agreement. Section 9.7 is not among the enumerated provisions. Undeterred, Plaintiffs claim that the Option Holder Letter incorporates all of Article IX, including Section 9.7.[181] That argument is based upon a mischaracterization and partial quotation of the parenthetical in paragraph "a". The parenthetical unambiguously includes only the "defined terms" of Article IX.[182]

---

[179] Option Holder Ltrs. ¶ (a).

[180] *Id.* ¶ (g).

[181] Pls.' Ans. Br. 46.

[182] The reference to Article IX in the parenthetical is most naturally read as the indirect object in the prepositional phrase "defined terms used in." Thus, the only part of Article

55

In signing the Option Holder Letter, the Individual Defendants agreed to be bound to certain terms of the Merger Agreement in their capacities as Escrow Participants, Indemnifying Security Holders, Qualifying Option Holders, and Securityholders. Section 9.7 of the Merger Agreement makes no reference to any of these groups. It only mentions each "Party" to the Merger Agreement. The breach of contract, breach of fiduciary duty, and aiding and abetting claims in Counts IV through VII are not asserted against the Individual Defendants in their capacities as stated in the Option Holder Letter.

Plaintiffs argue that, even if the Individual Defendants have not consented directly to the jurisdictional provision in the Merger Agreement, they are still bound by proxy. Plaintiffs maintain that the Individual Defendants are subject to personal jurisdiction because the (i) the Individual Defendants consented to have Fortis, as the Securityholders' Representative, serve as their agent and (ii) Fortis, as a Party to the Merger Agreement, consented to be bound by Section 9.7.[183]

This argument is unpersuasive for several reasons. First, Plaintiffs' legal support for this argument is inapposite. In *Aveta v. Cavallieri*, 23 A.3d 157 (Del. Ch. 2010), the court held that a signatory to a purchase agreement who appoints a

___

IX that the Option Holder Letter incorporates are the "defined terms used in . . . Article IX."

[183] Pls.' Ans. Br. 47.

stockholder representative is bound by the decisions of the stockholder representative as a matter of agency law. *See Aveta*, 23 A.3d at 163, 168, 170–71. The decision did not involve a party contesting personal jurisdiction, and unlike in *Aveta*, the Individual Defendants are not signatories to the Merger Agreement. In *McWane, Inc. v. Lanier*, 2015 WL 399582, at *9 (Del. Ch. Jan. 30, 2015), former stockholders who had asserted claims in Alabama relating to the merger agreement were held subject to the Delaware forum clause in the merger agreement under an estoppel theory. *McWane*, 2015 WL 399582, at *6–7. Plaintiffs here are not advancing an estoppel theory for jurisdiction. Neither *Aveta* nor *McWane* is applicable here.

Second, Pacira's argument ignores the plain terms of the Option Holder Letter establishing the scope of Fortis's permissible action.[184] Under Section (a) of the Option Holder Letter, the Individual Defendants agreed to be bound by "any and all actions and the making of any decisions required or permitted to be taken by the Securityholders' Representative under the Merger Agreement."

---

[184] *See, e.g.*, *Concors Supply Co., Inc. v. Gieske Int'l*, 1990 WL 28567, at *2 (Del. Super. Ct. Mar. 5, 1990) ("In general, a principal is only responsible for the acts of his agent which were done within the course of the agent's employment and within the scope of his authority."); *see also* Restatement (Second) Agency § 144 (1958) ("A disclosed or partially disclosed principal is subject to liability upon contracts made by an agent acting within his authority if made in proper form and with the understanding that the principal is a party."); *id.* § 219(1) ("A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.").

Read together, the Option Holder Letter and the Merger Agreement give Fortis a role in the distribution of the merger consideration to the Option Holders and authorize Fortis to enforce the Option Holders' right to receive that consideration. That is consistent with Section (g) of the Option Holder Letter, which grants this court jurisdiction over any claims "arising out of" the Option Holder Letter, including the provisions of the Merger Agreement that the Option Holder Letter incorporates. Plaintiffs point to nothing in the Merger Agreement that "require[s] or permits" Fortis to bind the Option Holders to the jurisdiction of Delaware courts for the resolution of disputes *beyond* what the Individual Defendants agreed. To accept Plaintiffs' theory, the court would render the provision in the Option Holder Letter granting consent to be bound by the enumerated provisions mere surplusage.[185] And it would flip on its head a structure designed to efficiently enforce the rights of the Option Holders *against* Pacira.[186]

Even if this court were to assume, *arguendo*, that the Individual Defendants consented to be bound by Section 9.7, the Plaintiffs have failed to establish that the fiduciary duty claims are covered by the exclusive forum provision.

---

[185] *See e.g.*, *NAMA Hldgs, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008).

[186] *See, e.g.*, *Ballenger v. Applied Digit. Sols., Inc.*, 2002 WL 749162, at *10 (Del. Ch. Apr. 24, 2002) ("To accomplish such efficiency, the merger agreement empowers plaintiffs . . . to act as 'Stockholders' Representatives' for all the selling . . . stockholders.").

Plaintiffs assert that, because Section 9.7 expressly covers both claims "based upon" and matters "contemplated []in" the Merger Agreement, it must be "read broadly" so as to encompass any claim that "touch[es] on" its rights or the performance of its contractual obligations under the Merger Agreement.[187] In support for that proposition, Plaintiffs cite to two cases by this court interpreting forum selection provisions much broader than Section 9.7. In *CA, Inc. v. Ingres Corp.*, 2009 WL 4575009 (2009), *aff'd*, 8 A.3d 1143 (Del. 2010), the forum clause covered "any claim directly arising out of or related to this Agreement." *Id*. at \*46. The court observed that "[t]his is a broad forum selection clause sweeping in all claims that 'arise out of' or 'relate to' the Legacy Support Agreement." *Id*. Similarly, in *ASDC Hldgs.*, 2008 WL 4552508, the relevant provision extended to "any claim or cause of action arising under or relating to this Agreement." *Id*. at \*5. The court explained that "[b]road forum selection clauses . . . which expressly cover, for example, all claims between the contracting parties that 'arise out of' or 'relate to' a contract, apply not only to claims dealing directly with the terms of the contract itself, but also to any issues that touch on contract rights or contract performance. (internal quotations omitted). *Id.* These cases are inapposite because the provisions they interpret, unlike the provision here, cover all claims that "relate to" the contract.

---

[187] Pls.' Ans. Br. 44–45.

"The phrase "relating to" is broader than the phrase 'arising out of.'" *Fla. Chem. Co. v. Flotek Indus, Inc.*, 2021 WL 3630298, at *10 (Del. Ch. Aug. 19, 2021). The Merger Agreement does not extend that far. By contrast, in *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124 (Del. Ch. 2008), the court held that a forum selection provision in a shareholder agreement covering claims made "in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein" did not reach contractual claims brought against a selling shareholder in his capacity as "an officer or director" of the company. *Id.* at 1130, 1132-33, 1138.

Plaintiffs concede that "the Individual Defendants' fiduciary obligations did not technically arise from the Merger Agreement."[188] Other than the MyoScience Securityholders' right to receive Milestone Payments, nothing in the Merger Agreement contemplates any fiduciary or contractual relationship between or among the Plaintiffs on the one hand and any of the Individual Defendants on the other. The Complaint does not base the fiduciary duty claims against Kumar and Preciado upon duties arising under the Merger Agreement. As to Kumar, the claim is based upon alleged duties "[a]s an agent of Pacira CryoTech pursuant to the Consulting Agreement . . . with access to confidential information provided by that agreement."[189] Similarly, as to Preciado, the fiduciary duty claim is based upon

---

[188] Pls.' Ans. Br. 47.

[189] Compl. ¶ 280.

60

alleged duties "[a]s an agent of Pacira CryoTech in her capacity as a key manager at Pacira CryoTech."[190]   Accordingly, the resolution of the dispute about whether Kumar and Preciado breached their fiduciary duties does not require the interpretation of the Merger Agreement.  *See Ashall Homes Ltd. v. ROK Ent. Grp. Inc.*, 992 A.2d 1239, 1252 n.66 (2010) (describing the test for whether a claim is "based on the contract containing the [forum] selection clause" as "whether the plaintiff's claims depend on rights and duties that must be analyzed by reference to the contractual relationship.");  *Flotek*, 2021 WL 3630298, at *10 ("For a claim to stem from the contractual relationship, it must be based upon the rights and obligations created by the underlying agreement." (internal quotations omitted)).

Plaintiffs argue that their fiduciary duty claims are "based on" the Merger Agreement because "viable causes of action for breach of fiduciary duty would not exist absent the Merger Agreement."[191]   This is the same "but for" theory that *Ruggiero* rejected, noting that the fiduciary duty claims over decision to approve stock options were—as here—"only tangentially related to the Merger Agreement"). 948 A.2d at 1130–31, 1138.   Section 9.7 cannot serve as the jurisdictional hook for Counts IV through VII.

---

[190] *Id.* ¶ 286.

[191] *Id.* at 45.

### 3.	Ancillary Personal Jurisdiction Theory

It is well-established that once a nonresident director or officer of a Delaware corporation or a manager of a Delaware LLC is properly subject to personal jurisdiction for a claim for breach of fiduciary duty pursuant to 10 *Del. C.* § 3114 or 6 *Del. C.* § 18-109(a), the court may subject that defendant to personal jurisdiction for claims that are "'sufficiently related' or '[not] distantly related' to the breach of fiduciary duty claim." *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *9 (Del. Ch. Feb. 27, 2020) (quoting *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 292 n.63 (Del. 2016)).   The doctrine has also been extended outside this paradigmatic context in a small set of cases where (i) the defendant had consented to the Court's jurisdiction by signing a contract with a jurisdictional provision; (ii) the pendent claim was found to be "sufficiently related"[192] to the anchor claim; and (iii) the Court found that the exercise of ancillary jurisdiction would comport with

---

[192] *Fitzgerald v. Chandler*, 1999 WL 1022065, at *4 (Del. Ch. Oct. 14, 1999); *Cap. Grp. Companies, Inc. v. Armour*, 2004 WL 2521295, at *2 (Del. Ch. Oct. 29, 2004).

due process.[193]  Plaintiffs seek to invoke this doctrine here, which has been referred to as "ancillary personal jurisdiction"[194] or "pendent personal jurisdiction."[195]

The doctrine of pendent personal jurisdiction has its roots in the jurisprudence of pendent subject matter jurisdiction.  *Olin v. Fisons PLC*, 47 F.Supp.2d 151, 155 (D. Mass. 1999).  It is described as "a federal case law doctrine."  *Nam Chuong Huynh v. Aker Biomarine Antarctic AS*, 2017 WL 2242299, at *13 (Wash. App. May 22, 2017) (declining to apply the doctrine and noting that "even if due process permits a [state] court to exercise pendent personal jurisdiction . . . the long arm statute must also permit jurisdiction"); *see also United States v. Botefuhr*, 309 F.3d 1263, 1272–75 (10th Cir. 2002) (exploring the doctrine and its origin); *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 123-24 (3d Cir. 2020) (discussing the Third Circuit's recognition of the doctrine in 1973).

---

[193] *See Chandler*, 1999 WL 1022065, at *2, *4 (noting that the court's "discretion emanates from a policy of achieving maximum judicial economy and efficiency of effort where substantive due process rights of the parties are not affected" and finding that the exercise of ancillary jurisdiction over pendent claims would comport with "traditional notions of fair play and substantial justice"); *Armour*, 2004 WL 2521295, at *2 (considering whether "the exercise of jurisdiction, in the context presented, comport[s] with due process."). In each of these cases, the court held that it had jurisdiction and declined to dismiss the anchor claims.  *See Chandler*, 1999 WL 1022065, at *3 ("No one can dispute that the Partnership Agreement's forum selection clause gives this Court personal jurisdiction over the defendants as a result of claims that the defendants breached the Partnership Agreement."); *Armour*, 2004 WL 2521295, at *2 ("[T]his court can exercise jurisdiction over Ritter in her capacity as trustee.").

[194] *Ruggerio*, 948 A.2d at 1138.

[195] *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at *7 n.73 (Del. Ch. Sept. 1, 2006), *aff'd*, 930 A.2d 92 (Del. 2007).

The exercise of personal jurisdiction under this doctrine is "entirely discretionary." *Ruggerio*, 948 A.2d at 1139. When deciding whether to exercise its discretion over the pendent claim, the court considers (i) whether it would have to consider a "significant number of facts wholly unrelated to those necessary to determine" the merits of the anchor claim; (ii) whether the claims seek similar or different relief; (iii) whether the claims are governed by Delaware law; and (iv) whether Delaware courts have a "strong interest" in adjudicating the issues raised by the pendent claim. *Id.* "Of course, if the only jurisdictionally sufficient claim is dropped or dismissed, particularly if that occurs early in the litigation, the pendent claim should be dismissed as well." *Gheewalla*, 2006 WL 2588971, at *7 n.73 (quoting 4A CHARLES ALAN WRIGHT ET. AL., FEDERAL PRACTICE AND PROCEDURE § 1069.7 (2d ed. 1995)); *see id.*, 2006 WL 2588971, at *7 (dismissing claims brought under ancillary personal jurisdiction theory after finding court lacked personal jurisdiction over anchor claim); *see also Botefuhr*, 309 F.3d at 1273 (discussing pendent personal jurisdiction and noting: "Generally, when a district court dismisses the [anchor] federal claims, leaving only supplemented state claims, the most common response . . . has been to dismiss the [ancillary] state claim or claims without prejudice.") (cleaned up); *Lisowski v. Henry Thayer Co., Inc.*, 501 F. Supp. 3d 316, 326 (W.D. Pa. 2020) (citing *Botefuhr*, 309 F.3d at 1273, for the same proposition); *Int'l Union, United Mine Workers of Am. v. CONSOL Energy, Inc.*,

64

465 F. Supp. 3d 556, 581 (S.D.W. Va. 2020) (declining to exercise pendent personal jurisdiction, reasoning that "if the court were to decide to exercise pendent personal jurisdiction in this case despite the obvious deficiencies in the claim serving as the source of jurisdiction, this would serve as an incentive to all plaintiffs who may lack personal jurisdiction to add meritless claims where federal personal jurisdiction is present to try to use them as a jurisdictional loophole.").

Plaintiffs have not established a statutory basis for personal jurisdiction over the Individual Defendants for any of their claims in Counts IV through VII. Nor have they demonstrated that subjecting these defendants to personal jurisdiction in Delaware for these claims would satisfy due process. Having granted the motion to dismiss the anchor claims against the Individual Defendants, I decline to exercise personal jurisdiction over the remaining counts against the Individual Defendants.

For these reasons, the motion to dismiss Counts IV through VII against the Individual Defendants is granted for lack of personal jurisdiction.

## III. CONCLUSION

For the foregoing reasons, the motions to dismiss by the Individual Defendants and by Fortis are granted in their entirety.

**IT IS SO ORDERED.**